UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SCOTT DONALDSON and AMY DONALDSON<br><br>VERSUS<br><br>SONESTA NOLA CORPORATION, ET AL. | CIVIL ACTION NO. 19-14706<br><br>JUDGE ZAINEY<br><br>MAG. JUDGE CURRAULT |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Sonesta NOLA Corporation; Certain Underwriters at Lloyd's, London Severally Subscribing to Policy No. 80509BOWCN1700913l; Jessie Muse; and the Muse Company, LLC (collectively "Defendants"), respectfully submit this memorandum in support of their Motion for Summary Judgment. As set forth more fully below, Plaintiffs' adult son died when he jumped through an exterior window in a high-rise building. While unquestionably tragic, Seth Donaldson's death was not caused by any action or inaction on the part of Defendants. Rather, Mr. Donaldson's death was the direct result of his deliberate decision to jump through a window after ingesting a cocktail of drugs including cocaine, LSD, and THC. Because Defendants did not violate any duty to Mr. Donaldson that would have prevented his death, the Court should grant Defendants' Motion for Summary Judgment and dismiss all of Plaintiffs' claims with prejudice.

### FACTUAL BACKGROUND

The facts of this case are not complicated. Cassidy Carter, a non-party to this lawsuit, rented unit 1201 at 212 Loyola Street (the "Apartment") from The Muse Company, LLC,

through AirBnB to use during Voodoo Festival on the weekend of October 27-28, 2018.[1] Ms. Carter shared the Apartment with Fahad Khan, her boyfriend and another non-party.[2]

Mr. Khan and Ms. Carter knew Seth Donaldson from their time in high school in their hometown of Hendersonville, North Carolina.[3] Prior to their visit, Mr. Khan spoke with Mr. Donaldson. Mr. Khan and Mr. Donaldson discussed meeting while Mr. Khan and Ms. Carter were in New Orleans for their trip.[4]

At around 12:30 a.m. on October 28, 2018, Ms. Carter and Mr. Khan met the decedent, Seth Donaldson, after he got off work.[5] Ms. Carter, Mr. Khan, and Mr. Donaldson then went to Bourbon Street until between 2:00 and 4:30 a.m., at which point they returned to the Apartment.[6] At some point during their time together, Seth Donaldson ingested "two tabs of acid," cocaine, and marijuana.[7] Mr. Donaldson's use of LSD, cocaine, and marijuana is corroborated by snapchat messages collected by the New Orleans Police Department,[8] the existence of LSD in powder form on a table in the Apartment,[9] and the toxicology report from Mr. Donaldson's autopsy.[10] According to the only eyewitnesses of Mr. Donaldson's death, Mr. Donaldson became

---

[1] Relevant portions of the deposition transcript of Jessie Muse are attached as Exhibit A at 70:1-7.

[2] Relevant portions of the deposition transcript of Fahad Khan are attached as Exhibit B at 16:24-25; 20:3-10.

[3] Ex. B, Khan Dep. Tr. at 9:1-23.

[4] Ex. B, Khan Dep. Tr. at 9:24-10:4.

[5] *See* Ex. B, Khan Dep. Tr. at 9:4-10:10; Police Report J-34869-18, attached as Exhibit C at 3; *see* Relevant portions of the deposition transcript of Officer Gabrielle K. Lewis are attached as Exhibit D at 15-17 (authenticating incident report).

[6] *Id*.; *see also* Supplemental Police Report J-34869-18, attached as Exhibit E at 3; Relevant portions of the deposition transcript of Detective Marshall Scallan are attached as Exhibit F at 12-14 (authenticating supplemental police report).

[7] Ex. E, Supplemental Police Report J-34869-18 at 4 (citing statement of Loren Grey).

[8] *See* Seth Donaldson snapchat records (message from @mik.thorpe to @sethhhhh at approximately 11:15 a.m. CST: "Omg you tried acid????" "How'd that go? [emoji, face with tears of joy]").

[9] Ex. D, Lewis Dep. Tr. at 34:24-35:15 (testifying that a white powdery substance was collected from a coffee table in the Apartment that was later determined to be LSD).

[10] Autopsy, OPCO-000014 attached as Exhibit G; Relevant portions of the deposition transcript of Dr. Cynthia Gardner are attached as Exhibit H at 24-26.

2

erratic following his ingestion of the drugs.[11] Mr. Donaldson discussed his brother's attempted suicide, removed his shirt, ran around the Apartment screaming, questioned whether he should "stay" or "go," and attacked Mr. Khan.[12] At approximately 5:46 a.m., Mr. Donaldson jumped through the closed window of the apartment and fell nine stories to his death.[13] Mr. Donaldson died instantly upon impacting the ground.[14]

All evidence adduced to date supports the conclusion that Mr. Donaldson did not accidentally fall through the window. New Orleans Police Detective Marshall Scallan, concluded that Mr. Donaldson almost certainly ran at the window before jumping through it.[15] Mr. Donaldson's uncontested final moments have been corroborated by both of the eyewitnesses and a neighbor, Stephen James.[16] Furthermore, Dr. Richard Roniger, an expert retained by Defendants, determined that the conduct attributed to Mr. Donaldson immediately preceding his death was consistent with behavior that could be expected from a person who ingested cocaine, marijuana, and LSD.[17]

The window through which Mr. Donaldson jumped had no defects and was compliant with all building codes. It was also an open and obvious condition. Indeed, as the building

---

[11] 9-1-1 Transcript attached as Exhibit I, at 4:14-25 ("Okay, basically, my friend – like, we were at the VooDoo Festival, whatever downtown, whatever. Guess he got some bad drugs or something. We came up from the bars and he started freaking out like. And then he was like in the hallway for a little while and [expletive], like, freaking out . . . .")

[12] Ex. E, Supplemental Police Report J-34869-18 at 3-4; Ex. F, Scallan Dep. Tr. at 28:22 -29:10 and 32:5 – 36:22.

[13] Ex. E, Supplemental Police Report J-34869-18 at 4; Ex. I, 9-1-1 Tr. at 2:8-13 ("I am at the – my friend literally, like took – and he literally jumped out of the [expletive] window."); *Id*. at 4:22-25 ("[H]e [expletive] jumped out of the God damn window and [expletive] landed, like, [expletive] ten floors down.")

[14] *See* Ex. H, Gardner Dep. Tr. at 67:7-19 (Q: "Based on your analysis, did Seth Donaldson die instantly upon impacting the ground?" A: "Yes" Q: "How confident are you in that conclusion?" A: "I'm very confident." Q: "On a scale of, like, 1 to 10 with 1 being the least confident and 10 being the most confident, where would you place this one?" A: "At 10, the most confident. I'm confident.").

[15] Ex. F, Scallan Dep. Tr. at 42:24 – 43:17 ("Given, I mean, given the investigation and all the evidence that I had, I determined, yes, that he ran towards the window.").

[16] *See* Ex. C, Police Report J-34869-18 at 3

[17] Expert Report of Dr. Richard Roniger, attached as Exhibit J at 1-2.

3

inspection report on which Plaintiffs rely explicitly states, the window was "in good condition and [wa]s anticipated to be serviceable through the term."[18] Further, while several building codes governed the placement and strength of the windows at the time of Mr. Donaldson's death, the window was compliant with all of these codes.[19] The window through which Mr. Donaldson jumped was sturdy and capable of resisting a significant amount of impact force (at least 60 pounds per square foot).[20] However, it was simply not designed to prevent an adult man from jumping through it head-first. Mr. Donaldson almost certainly knew this, which is why he regrettably chose to use the window as his exit point when he tragically leapt to his death.[21]

Following investigation by the New Orleans Police Department and the New Orleans Coroner's office, the cause of Mr. Donaldson's death was determined to be "multiple blunt trauma injuries" and the manner of death was determined to be "suicide."[22] Despite a thorough investigation, the New Orleans Police department was unable to find any evidence to contradict the testimony of the eyewitnesses that Mr. Donaldson killed himself by jumping through the window, and they were unable to generate any competing theories as to the cause of Mr. Donaldson's death.[23] Similarly, the New Orleans Coroner's Office conclude—based upon the scene investigation, witness interviews, its autopsy, and the toxicology report—that Mr. Donaldson's death was a "suicide" as opposed to "accidental" or "undetermined."[24] Dr. Gardner

---

[18] *See* Expert Report of Kerwin Julien, attached as Exhibit K at 6-7 (quoting CODA report)

[19] *See* Ex. K, Julien Report at 7-8

[20] Ex. K, Julien Report at 8-9.

[21] There was no evidence that Mr. Donaldson was throwing himself at walls indiscriminately. His decision to launch himself at the window was conscious and likely done with the understanding that the window would give way to his body.

[22] *See* Ex. G, Coroner's Report, OPCO-000006.

[23] *See* Ex. D, Lewis Dep. Tr. at 76:22-77:18 (Q: "[B]ased on your understanding and your investigation, you believe that Seth Donaldson jumped out of this window?" A: "Yes.").

[24] Ex. H, Gardner Dep. Tr. at 65:25-68:9.

4

further testified that the Coroner's Office did not develop any theory that competed with its ultimate conclusion that Mr. Donaldson died by suicide.[25]

In summary, Mr. Donaldson killed himself when he jumped through a sturdy, code-compliant, closed window. Plaintiffs have no evidence to rebut these dispositive facts. Accordingly, Defendants did not violate any duty to Mr. Donaldson that caused or contributed to his death, and Plaintiffs' claims must be dismissed.

## LAW & ARGUMENT

### I. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if its existence or nonexistence might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50. The moving party may succeed by showing that the non-moving party cannot produce admissible evidence on an essential element of the claim. *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).

---

[25] Ex. H, Gardner Dep. Tr. at 66:12-15.

## II. Defendants are entitled to summary judgment on Plaintiffs' Claims.

"The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty, and whether a duty is owed is a question of law."[26] Louisiana Civil Code article 2315 provides that that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." However, when damages are claimed as a result of vices or defects in the thing within one's custody, La C.C. art. 2317.1 governs the duty owed to the plaintiff.

### a. Defendants are not liable under La. Civ. Code art. 2315.

Defendants are not and cannot be held liable for Mr. Donaldson's death under a general negligence theory because the Defendants did not owe Mr. Donaldson a legal duty to protect him from the particular harm he allegedly sustained. "To prove liability under a duty-risk analysis, the plaintiff must establish that the defendant's conduct was the cause-in-fact of the resulting harm, that the defendant owed a duty to the plaintiff which was breached and the risk of harm was within the scope of protection afforded by the duty breached."[27] Duty is a question of law for the court to decide.[28] "Simply put, the inquiry is whether the plaintiff has any law—statutory, jurisprudential or arising from general principles of fault—to support his claim."[29]

In Louisiana, there is no general duty to prevent another person from committing suicide.[30] While such a duty can be created in narrow circumstances, the facts do not support the imposition of such a duty in this case. A duty to prevent a person from harming himself

---

[26] *Bufkin v. Felipe's Louisiana, LLC*, 14-0288, p. 5 (La. 10/15/14), 171 So. 3d 851, 855 (citation omitted).

[27] *Reg'l Transit Auth. v. Lemoine*, 93-1896 (La. App. 4 Cir. 11/16/95), 664 So. 2d 1303, 1309, *writ denied*, 96-0412 (La. 3/29/96), 670 So. 2d 1234.

[28] *E.g.*, *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So. 2d 318, 322.

[29] *Haydin v. Crescent Guardian, Inc.*, 2001-1986 (La. App. 4 Cir. 5/15/02), 818 So. 2d 1033, 1040 (citing *Faucheaux v. Terrebonne Consol. Gov't.*, 615 So. 2d 289, 292 (La.1993).

[30] *See*, *e.g.*, *Millet v. Treasure Chest Casino LLC*, No. 00-CA-1843 (La. App. 5 Cir. 5/30/2001) 788 So. 2d 713, 716.

6

traditionally arises in the following specific relationships: prison/inmate; hospital/patient; doctor/patient; or pharmacist/mentally incompetent patient.[31] A lessor has no duty to a lessee—much less a third-party guest of a lessee—to prevent him from intentionally harming himself because, among other reasons, the lessor has no knowledge of the mental condition of the lessee.

In the absence of a special relationship, Plaintiffs must establish that Mr. Donaldson's suicide was caused by negligence of the Defendants.[32] Plaintiffs cannot make this showing because there is no evidence that Mr. Donaldson's decision to jump out of window was triggered by the negligence of the Defendants. To the contrary, the undisputed facts establish that Mr. Donaldson's decision to jump through the window of Defendants' Apartment was brought about by his own decisions—chief among them being his decision to ingest cocaine, LSD, and marijuana.

Because plaintiffs cannot support the duty element of a claim under Article 2315 of the Louisiana Civil Code, they cannot maintain a cause of action for negligence against any of the Defendants.

**b. Defendants Are Not Liable Under La. Civ. Code arts. 2317 & 2317.1.**

Article 2317 provides that a person is "responsible, not only for the damage occasioned by our own act, but for… the things which [the person has] in [his/her] custody." This general principle is modified by Article 2317.1, which states:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of *res ipsa loquitur* in an appropriate case.

---

[31] *Penton v. Clarkson*, No. 93-0657 (La. App. 1 Cir. 03/11/94) 633 So. 2d 918, 923.

[32] *Id*. at 923-24.

To prevail on a claim under Articles 2317 and 2317.1, a plaintiff must prove three elements by a preponderance of the evidence: (1) the defendant either owned or had care, custody, or control of the thing in question; (2) the thing was a cause-in-fact of the plaintiff's injuries; and (3) the thing presented an unreasonable risk of harm.[33] In addition, the plaintiff must prove: (1) that the defendant knew or should have known of the vice or defect; (2) that the damage could have been prevented by the exercise of reasonable care; and (3) that the defendant failed to exercise such reasonable care.[34] Thus, "[a] building owner is not responsible for all injuries resulting from any risk posed by his building; he is only liable for those injuries caused by an unreasonable risk of harm to others."[35]

Here, Plaintiffs cannot establish the essential elements of their burden of proof under Articles 2317 and 2317.1 because Mr. Donaldson's death was not caused by a vice or defect in the premises.[36] Rather, it was caused by Mr. Donaldson's decision to run and jump through a window. Immediately after Mr. Donaldson's death, his friend Fahad Khan, who was an eyewitness to the death, described Mr. Donaldson's death to a 9-1-1 dispatcher as follows:

> I guess he just, like – hum, we were just at the bars or whatever. Like we just met up. He just got off work, went out to the bars. And I think he took some, like, acid or something and like we were – we had just got home. We had just got back and then he started – we were about to go to bed, starts freaking out and like crazy and – like [expletive] – And, like, I had my girlfriend calming him down and then he, like, kicked her and, like, ran out into the [expletive] like the elevator area and we were trying to calm him down. So I was like, Seth, just like you need to chill out and, like, you

---

[33] *Daniel v. Clarion Inn & Suites*, 2016-0760, p. 3 (La. App. 4 Cir. 2/22/17), 214 So. 3d 38, 41.

[34] *Id.*

[35] *Celestine v. Union Oil Co. of California*, 94-1868 (La. 4/10/95), 652 So. 2d 1299, 1303 (citing *Entrevia v. Hood*, 427 So. 2d 1146, 1149 (La. 1983) (emphasis added).

[36] There is simply no evidence that glass must withstand the force of an adult trying to break it. This defies common sense as, in many cases, windows must break to permit a person to exit through them in emergencies, like fire. *See Slaid v. Evergreen Indem., Ltd.*, 32,363 (La. App. 2 Cir. 10/27/99, 7–8); 745 So. 2d 793, 798.

> know, come back in the room, whatever. And then he gets back in the room and he jumps out of this [expletive] window and now he's [expletive] dead.

The closed window through which Mr. Donaldson jumped did not contain any vice or defect.[37] Defendants obtained the expert opinion of Kerwin Julien, a registered Professional Engineer in Civil Engineering.[38] As Mr. Julien states in his expert report, the window in the Apartment met all relevant building codes.[39] No building code requires a window to resist the force of an adult male taking a running jump into it.[40] Rather, the only building code related to window break strength relates to resisting wind speeds of 140-mph—i.e. external weather forces. This code is irrelevant to Mr. Donaldson's injury because there is no evidence that a window capable of resisting 140-mph winds is necessarily capable of resisting the force of an adult male jumping through it.[41] Furthermore, there is no evidence that the window Mr. Donaldson broke was incapable of resisting 140-mph winds. To the contrary, the building's history indicates that, prior to Mr. Donaldson's jump, the window had actually withstood significant wind events that tested its code compliance.[42]

There were no other conditions in the Apartment that rendered the code-compliant window unreasonably dangerous. While Plaintiffs have suggested that the placement of furniture in the room made the window unnecessarily dangerous, there is no evidence that the placement

---

[37] The police inspecting the scene did not deem a similar window in the same apartment to be dangerous. *See* Ex. D, Lewis Dep. Tr. at 111:17-112:11.

[38] Ex. K, Julien Report at 9.

[39] *Id*.

[40] Ex. K, Julien Report at 9 (concluding that Mr. Donaldson would have to be travelling at three times normal walking speed to break the window glass).

[41] This is especially true where the decedent impacted the window with enough force to continue to travel approximately 20 feet before he hit the ground. *See* Ex. D, Lewis Dep. Tr. at 25:16-26:8 (identifying distance body travelled before impacting the ground).

[42] Ex. K, Julien Report at ¶ 4(c).

9

of furniture in the room somehow caused or contributed to Mr. Donaldson's death.[43] The decedent's mother admits that she has developed nothing more than "speculation" as to the cause of her son's death, and, when asked whether she knew "how it was that Seth came to be in contact with the window on the night in question," Ms. Donaldson responded "[n]o, I don't."[44] None of the eyewitnesses to Mr. Donaldson's death have attributed his death to the furniture in the Apartment, and such a connection cannot be implied. Absent actual evidence to tie Mr. Donaldson's death to the furniture in the Apartment, Plaintiff's allegations are "mere hypothetical theories that fail to withstand summary judgment motions."[45] Accordingly, Plaintiffs' arguments regarding the position of the sofa are irrelevant. Even if this were not the case, Plaintiffs' claims would nevertheless fail because the evidence establishes that the couch was not inherently dangerous.[46]

### c. Even if Plaintiffs can show that a defect in the building caused Mr. Donaldson's fall, which is denied, any alleged defect was open and obvious.

As the Louisiana supreme court has emphasized, "a defendant generally does not have a duty to protect against that which is obvious and apparent."[47] "In order for a hazard to be considered open and obvious, the supreme court has consistently stated the hazard should be one

---

[43] *See also* Ex. D, Lewis Dep. Tr. at 63:9-64:6 (stating that there was no evidence to contradict the eyewitness' testimony that Seth jumped out of the window).

[44] Relevant portions of the deposition transcript of Plaintiff Amy Donaldson is attached as Exhibit L at 73:25-74:3. *See also id.* at 43:1-2 ("I know that I will never know exactly what happened.") 68:5-69:3 (Q: "Has your own – what I will call your own personal investigation into Seth's death, have you determined what actually happened, what actually led to his death on October 28, 2018?" A: "No.").

[45] *Cole v. Seal Enters.*, No. 20-2248, 2021 WL 2351125, 2021 U.S. Dist. LEXIS 107850, at *21 (E.D. La. Jun 9, 2021).

[46] *Id. See also* Ex. K, Julien Report at 5, 9 (demonstrating that it is common practice to place couches in front of windows and concluding that placing a couch in front of a window "would actually serve to prevent a person from coming into contact with the window"); Ex. D, Lewis Dep. Tr. at 111:11-15 (noting that the investigating officer did not notice any dangerous conditions in room other than broken window).

[47] *Bufkin*, 171 So.3d at 856.

that is open and obvious to all."[48] While Mr. Donaldson's knowledge of the allegedly dangerous condition is relevant, the focus of the inquiry is "on the global knowledge of everyone who encounters the defective thing or dangerous condition."[49] If the dangerous condition is deemed to be open and obvious, summary judgment is appropriate.[50]

Here, the window through which Mr. Donaldson jumped was clearly an open an obvious condition. A condition is open and obvious if it is "obvious to everyone who may potentially encounter it."[51] There is absolutely no evidence that the height or location of the window was obscured or otherwise difficult to see. As the pictures below indicate, the window would have been readily apparent to anyone who entered into the room:[52]

---

[48] *Jones v. Stewart*, 2016-0329 (La. App. 4 Cir. 10/5/16), 203 So. 3d 384, 392.

[49] *Id*.

[50] *Allen v. Lockwood*, 2014-1724 (La. 2/13/15), 156 So. 3d 650, 653 (appellate court should have considered open and obvious issue on summary judgment); *see also Bufkin*, 171 So. 3d at 861 (reversing trial court and granting summary judgment to defendant because allegedly defective condition was open and obvious); *Rodriguez v. Dolgencorp, LLC*, 2014-1725 (La. 11/14/14), 152 So. 3d 871, 872 (same); *Ludlow v. Crescent City Connection Marine Div.*, 2015-1808 (La. 11/16/15), 184 So. 3d 21, reh'g denied, 2015-1808 (La. 1/15/16), 184 So. 3d 702 (same).

[51] *See Bufkin,* 171 So. 3d at 856.

[52] *See* Exhibit 2 to Jessie Muse Deposition, attached as Exhibit M. Relevant portions of Mr. Muse's deposition are attached as Exhibit A.



EXHIBIT 2 in globo



Initial Disclosures 004

Windows like the one at issue in this case are open and obvious conditions.[53]

Furthermore, and significantly, Mr. Donaldson did not accidentally fall through the window.[54] He tragically committed suicide by jumping through it. Implicit in Mr. Donaldson's decision to jump through the window is an appreciation of the likelihood that the window would give way to the force and weight of his body. Accordingly, there can be no reasonable dispute that the alleged defect—a closed window—was an open and obvious condition. Accordingly, the Court should grant summary judgment in favor of Defendants and dismiss Plaintiffs' claims with prejudice.

### III. Defendants are entitled to summary judgment on Plaintiffs' claim for loss of support damages.

Based upon the foregoing alone, Defendants are entitled to summary judgment on and dismissal of Plaintiffs' claims in full. However, even if summary judgment is denied, the Court should grant partial summary judgment dismissing any claim for loss of support damages because Plaintiffs have not and cannot demonstrate that their son provided any prior monetary support.

Plaintiffs' Complaint did not pray for recovery of any damages for loss of support.[55] Despite this, Plaintiffs produced the expert report of Shael Wolfson, estimating "the loss of support capacity" allegedly sustained by Plaintiffs as a result of the death of Mr. Donaldson.[56]

---

[53] *See*, *e.g.*, *Sergio Perez v. Machinery Movers of New Orleans*, 2011-11157 (Orleans Par. July 24, 2017) ("This court finds that there was no duty to warn of the allegedly dangerous defective condition (window) because it was open and obvious, visible to all, and did not create an unreasonable risk of harm."), attached as Exhibit N.

[54] Mr. Julien's report confirms this. *See* Ex. K, Julien Report at 8-9.

[55] Pet., R. Doc. 1-1 at ¶ 55, Prayer for Relief.

[56] A copy of Plaintiffs' expert report of Shael Wolfson is attached as Exhibit O at 1.

13

However, as a matter of law, in order to recover damages for loss of support, a "plaintiff . . . must show actual prior monetary support."[57]

Here, Plaintiff Scott Donaldson is a healthy practicing physician who is a urologist.[58] Plaintiffs have not alleged and there is absolutely no evidence to support an allegation that Mr. Donaldson previously provided "actual prior monetary support" to his parents on his modest salary of $18,878 per year working as a chef in various establishments.[59] Thus, Defendants are entitled to summary judgment on Plaintiffs' claim, if any, for loss of support damages, and it must be dismissed with prejudice.

## CONCLUSION

For the reasons set forth more fully above, the Court should grant Defendant's Motion for Summary Judgment and dismiss Plaintiffs' claims in full.

---

[57] *Hancock v. Higman Barge Lines, Inc.*, No. 16-14998, 2017 WL 3582433, at *4 (E.D. La. Aug. 18, 2017) ("Plaintiffs have not stated a claim for loss of support under the wrongful death action, which is required in order to seek loss of wages and wage-earning capacity" because they have neither alleged nor demonstrated any actual prior monetary support.) (citation removed); *see Quatroy v. Jefferson Par. Sheriff's Off.,* No. 04-1425, 2009 WL 961261, at *5 (E.D. La. Apr. 7, 2009) (granting partial summary judgment on claim for loss of support where no prior monetary support was provided and collecting cases); *Williams v. City of New Orleans*, 433 So. 2d 1129, 1137 (La. App. 4 Cir. 1983)) ("To be compensated for loss of support a plaintiff must show actual prior monetary support."); *Ogaard v. Wiley*, 325 So. 2d 642, 650-51 (La. App. 3 Cir. 1975) (stating same).

[58] Relevant portions of the deposition transcript of Scott Donaldson, which are attached as Exhibit P at 6:17-7:14-16, 11:18-23.

[59] *Williams*, 433 So. 3d at 1137; *see* Ex. O, Wolfson Report at 2 (stating that Mr. Donaldson earned $18,878 in 2018).

14

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:   */s/ Sarah M. Smith-Clevenger*
      Mark C. Dodart (Bar #17549)
      R. Harrison Golden (Bar #38468)
      Sarah M. Smith-Clevenger (Bar #38412)
      Canal Place | 365 Canal Street, Suite 2000
      New Orleans, Louisiana 70130-6534
      Telephone: 504-566-1311
      Facsimile: 504-568-9130
      Email: mark.dodart@phelps.com
             harris.golden@phelps.com
             sarah.smith-clevenger@phelps.com

**ATTORNEYS FOR DEFENDANTS SONESTA NOLA CORPORATION, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, JESSIE MUSE, AND THE MUSE COMPANY, LLC**